IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

Criminal No. 18-0152-18
ELECTRONICALLY FILED

v.

MONTA BANKS, et al,

Defendants.

**MEMORANDUM OPINION**

Presently before the Court is Defendant, Monta Banks', Motion to Vacate under

28 U.S.C. § 2255 (ECF 1707), his Motion to appoint counsel (ECF 1708), and his Motion to

*proceed in forma puaperis*.  ECF 1709.  After issuing the required Miller Notice, counsel for the

Government filed a response in opposition to the Motion to Vacate.  ECF 1773.

Given the voluminous nature of Defendant's motion, this Court has prepared this instant

thorough Opinion which addresses each Defendant's concerns.  That said, the Court notes that

the overarching theme to Defendant's motion is that months after rejecting the Government's

first formal written plea offer, he orally accepted it, but was presented with a different written

formal plea offer and he was essentially coerced by his counsel and the AUSA into agreeing to

this second, allegedly less favorable, offer.

For the reasons set forth below, the Court will deny Defendant's motion to appoint

counsel, deny (as moot) his motion to proceed in forma pauperis, and deny Defendant's Motion

to Vacate (hereinafter his "2255 petition").  The Court also declines to hold a hearing on his

2255 petition, and will not issue a certificate of appealability for the reasons set forth below.

I.      **Factual and Procedural History**
        **A. Events Prior To Defendant's Change of Plea Hearing**

On June 12, 2018, Defendant was indicted (along with 11 other co-defendants) at criminal number 18-cr-150 in *United States v. Monta Banks, et.al.*.  Also on June 12, 2018, 23 other defendants were indicted at criminal number 18-cr-152, in *United States v. Jewell Hall et. al.*  Initially, Defendant was only indicted *United States v. Monta Banks, et.al.*. (hereinafter referred to as "18-cr-150").

In the indictment in case number 18-cr-150, Defendant was charged with three counts of conspiracy to possess with intent to distribute various quantities of crack, heroin, and cocaine. ECF 3, case no. 18-cr-150.

In July of 2018, Neil Rothschild was appointed as Defendant's counsel.  ECF 150, case no. 18-cr-150.  Defendant was detained (having waived his right to a detention hearing), and Defendant and his attorney began to negotiate a plea deal with the Government.  On October 18, 2018, this Court held a status conference and learned that the bulk of discovery had been completed, and that all discovery would be disclosed to all defendants within thirty days.  ECF 207, case no. 18-cr-150.  On December 10, 2018, the Government tendered its first formal plea offer to Defendant through his attorney, Neil Rothschild.[1]  ECF 1773-1, case no. 18-cr-152 ("the 2018 Plea Offer").  By the end of December 2018, one of Monta Banks' co-defendants, Robert Moore, in case no. 18-cr-150 had pled guilty.

---

[1] This plea offer, which was signed by the United States Attorney, Scott W. Brady, was sent to Defendant's attorney via email on December 10, 2018, and indicated in pertinent part:

> Pursuant to Rule 11(c)(1)(C), the parties stipulate and agree that any sentence imposed upon Monta Banks shall include a minimum term of imprisonment of not less than 10 years. The parties understand that this minimum term of imprisonment shall serve as a sentencing floor, and the Court may impose a sentence greater than 10 years' imprisonment.

ECF 1773-1, case no. 18-cr-152.

A second status conference in case no. 18-cr-150 was held on January 23, 2019.   On February 20, 2019, another co-defendant, Lawrence Morrison, in case number 18-cr-150 pled guilty.

The Court held a third status conference in case no 18-cr-150 on March 6, 2019, with all of the remaining defendants' counsel. ECF 279, case no. 18-cr-150.  Defendant Banks' counsel, Neil Rothschild, attended this status conference on Defendant's behalf.  During this status conference, the Court announced a change of plea date for co-defendant, Mark Givens, and set a trial date of January 13, 2020, for all remaining defendants, noting that if most of the remaining defendants were to plead out, the Court would consider consolidating the case filed at 18-cr-150 with a case filed 18-cr-152.  ECF 279, case no. 18-cr-150.  On March 12, 2019, Defendant filed a motion requesting a pre-plea presentence investigation report, which this Court granted the same day.  ECF 285 and ECF 286, case no. 18-cr-150.

On March 31, 2019, Defendant's counsel, Neil Rothschild filed a motion to withdraw as counsel for Defendant.  The motion indicated, in relevant, part as follows:

> 3. Counsel has reviewed pertinent discovery materials, reviewed the defendant's criminal history and has evaluated all the risks defendant faces in this matter in light of the evidence and sentencing alternatives and variables.
>
> 4. Counsel has met with the defendant four times at the Allegheny County jail.
>
> 5. Counsel has had numerous conversations and email exchanges with the government concerning potential resolutions of the case.
>
> 6. A pre-plea investigation has been requested.
>
> 7. Recently, the relationship between counsel and the defendant has deteriorated and the defendant has asked counsel to file a motion to withdraw verbally during their last meeting and followed up with a letter requesting counsel to withdraw.

8. Defendant recently sent a letter to the Disciplinary Board making unfounded and misleading complaints about counsel. Those complaints were summarily dismissed by the Board.

9. At this juncture, counsel believes that there is good cause to grant a withdrawal as the relationship between counsel and the defendant seems to be at a place where it would not be productive or prudent to continue the attorney-client relationship.

10. There is more than sufficient time for new counsel to prepare and adequately represent the defendant as trial is not scheduled until January 2020 and the deadline for filing pre-trial motions is not until December 2019.

ECF 289, 18-cr-150.  On April 11, 2019, the Court granted Attorney Rothschild's motion to withdraw as counsel for Defendant via a text Order.  See entry at ECF 296, case no. 15-cr-150. On April 12, 2019, Komron Maknoon was appointed to represented Defendant, and Attorney Maknoon entered his appearance on April 17, 2019.  ECF 298 and ECF 300, case no. 18-cr-150.

Defendant's pre-plea presentence investigation report was filed on May 10, 2019.  ECF 314, case no. 15-cr-150.  In June of 2019, co-defendant, Rasheem Littleberry pled guilty.  ECF 333, case no. 18-cr-150.  In August of 2019, the Government sent Defendant's new counsel (Attorney Maknoon) a copy of the 2018 Plea Offer which noted that Defendant was a career offender. ECF 1773-2.

In September of 2019, co-defendants, Charles Jones and Raymond Chrzanowski, pled guilty.  ECF 363 and ECF 372, case no. 18-cr-150.  On October 3, 2019, co-defendant, Kellie Gossett, pled guilty.  ECF 383, case no. 18-cr-150.  Of the 12 defendants charged at criminal case number 18-cr-150, six of the defendants (including Defendant Banks) had not pled guilty by October 3, 2019.

On October 8, 2019, a superseding indictment was returned by the grand jury against Defendant, his five remaining co-defendants from criminal case number 18-cr-150, and the

codefendants in criminal case number 18-cr-152.  See ECF 601 and ECF 602, case no. 18-cr-152.  In the superseding indictment, Defendant was charged with: (1) conspiracy to possess with intent to distribute and to distribute 280 grams or more of cocaine base at Count One of the superseding indictment; (2) conspiracy to possess with intent to distribute and to distribute 28 grams or more of cocaine base at Count Three of the superseding indictment; (3) conspiracy to possess with intent to distribute and to distribute a quantity of heroin at Count Four of the superseding indictment; (4) conspiracy to possess with intent to distribute and to distribute a quantity of cocaine at Count Five of the superseding indictment; (5) possession with intent to distribute and distribution of a mixture and substance containing detectable amounts of heroin, cocaine, and fentanyl at Count Seven of the superseding indictment; and (6) a felon in possession of a firearm and ammunition at Count Eight of the superseding indictment.

Defendant was arraigned on the superseding indictment on November 15, 2019.  Shortly thereafter, Attorney Maknoon, Defendant, and the Government resumed their plea deal discussions.  These discussions eventually led the Government to extend a second formal plea offer on November 22, 2019 ("the 2019 Plea Offer").  ECF 1773-3.

In the 2019 Plea Offer (which Defendant ultimately accepted), Defendant agreed to the following:

(1) Defendant would plead guilty to the lesser included offense at Count Three of the superseding indictment, specifically, conspiracy to possess with intent to distribute and to distribute a quantity of cocaine base.

(2) Defendant would plead guilty to conspiracy to possess with intent to distribute and to distribute a quantity of heroin at Count Four of the superseding indictment.

(3) Defendant would plead guilty to conspiracy to possess with intent to distribute and to distribute a quantity of cocaine at Count Five of the superseding indictment.

(4) Defendant would plead guilty to possession with intent to distribute and distribution of a mixture and substance containing detectable amounts of heroin, cocaine, and fentanyl at Count Seven of the superseding indictment.

See ECF 1773-3, and the executed plea agreement filed at ECF 847-1. [2]

The 2019 Plea Offer (which Defendant accepted), contained the following language concerning Defendant's term of imprisonment which was identical to the 2018 Plea Offer:

> Pursuant to Rule 1l(c)(1)(C), the parties stipulate and agree that any sentence imposed upon Monta Banks shall include a minimum term of imprisonment of not less than l0 years. The parties understand that this minimum term of imprisonment shall serve as a sentencing floor, and the Court may impose a sentence greater than l0 years' imprisonment.

ECF 1773-3, case no. 18-cr-152.

On December 10, 2019, the Government filed an Information to Establish Prior Conviction in accordance with 21 U.S.C. 851.  On December 11, 2019, Defendant accepted the 2019 Plea Offer, and during a change of plea hearing before this Court, pled guilty to a lesser included offense at Count 3 of the superseding indictment (conspiracy to possess with intent to distribute and distribute a quantity of cocaine base).  He also pled guilty that same day to the offenses charged at Count 4 (conspiracy to possess with intent to distribute and distribute a quantity of heroin), Count 5 (conspiracy to possess with intent to distribute and distribute a

---

[2] Defendant Banks has a different version of these facts.  Although Defendant admits that he initially rejected the 2018 Plea Offer while Attorney Rothschild was his attorney, he claims that after the grand jury returned the superseding indictment, on October 8, 2019, he accepted the 2018 Plea Offer – not the 2019 Plea Offer – while being represented by Attorney Maknoon.  Defendant's version of these facts (as set forth in his 2255 Petition and his Reply to the Government's brief in opposition) also generally suggests that Attorney Maknoon (along with the Government's attorney) either duped or deceived him into taking the 2019 Plea Offer.

quantity of cocaine), and Count 7 (possession with intent to distribute and distribution of a

mixture and substance containing heroin, cocaine and fentanyl) of the superseding indictment.

### B. The Change of Plea Hearing

During the change of plea hearing held on December 12, 2019, Defendant testified under

oath.  The following relevant testimony was elicited by the Court during that hearing:

> THE COURT: Do you understand that, having been sworn, your answers
> to my questions are subject to the penalties of perjury or making a false
> statement if you do not answer truthfully?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: The Court is informed that you wish to change the plea that
> you previously entered to a plea of guilty to Counts 4 and 5, each count
> charging you with conspiracy to possess with intent to distribute and
> distribute a quantity of heroin, in violation of Title 18 United States Code
> Section 846, and Count 7, possession with intent to distribute and
> distribution of a quantity of heroin, cocaine and fentanyl, in violation of
> Title 21 United States Code Section 841(a)(1) and 841(b)(1)(C), and to a
> lesser included offense at Count 3, specifically, conspiracy to possess with
> intent to distribute and distribute a quantity of cocaine base, contrary to
> the provisions of Title 21 United States Code Sections 841(a)(1) and
> 841(b)(1)(C), in violation of Title 21 United States Code Section 846.
> Correct, sir?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Further, the Court is also informed that your plea contains
> a stipulated sentence. Pursuant to 11(c)(1)(C), the parties have agreed that
> any sentence imposed upon the Defendant shall include a minimum term
> of not less than ten years. The parties understand that this minimum term
> of imprisonment shall serve as a sentencing floor, and the Court may
> impose a sentence greater than the ten years' imprisonment. The Court is
> further informed that pursuant to Rule 11(c)(1)(C), that you wish the Court
> to accept your plea and sentence you in accordance with that stipulated
> sentence. Is that correct?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Counsel, on behalf of the Defendant, is that a fair statement
> of the stipulation relating to the sentence?

MR. MAKNOON: It is, Your Honor. And may I address the Court seated?

THE COURT: Sure. Agreed, Counsel, on behalf of the Government?

MS. GOODMAN: Yes, Your Honor.

ECF 1184, p. 2-4.

Next, the Court, to ensure that Defendant was making a valid plea, asked Defendant a series questions to determine if Defendant was capable of understanding the terms set forth in his 11(c)(1)(C) plea agreement, and if he understood each trial right he would have to give up by pleading guilty.  Id., p. 7-11.  Defendant acknowledged that he understood each and every trial right he was relinquishing, and he testified that he understood the terms of his 2019 Plea Agreement. After discussing all of the trial rights Defendant would have to give up to plead guilty, Defendant stated that he still intended to plead guilty to the charges the Court described at the beginning of the hearing. Id., p. 11.

Following this exchange, the Court then went on to confirm that Defendant understood the maximum sentence that could be imposed, as follows:

> THE COURT: The maximum sentence I'm authorized to impose under the law, including any applicable mandatory minimums for the commission of each of the offenses at Counts 4, 5 and 7 and the lesser included offense at Count 3 of the superseding indictment to which you intend to plead guilty, as you and the Government have agreed and as set forth in your plea agreement, is a term of imprisonment of not more than 30 years, a fine not to exceed two million dollars, a term of supervised release of at least six years, and a special assessment of $400. Do you understand the potential sentence that the Court is authorized to impose?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: The Court may order the sentences imposed at each count to run concurrently or may order that these sentences at each count to run consecutively. Understand?
>
> THE DEFENDANT: Yes, sir.

> THE COURT: And did you discuss that matter in detail with your attorney?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Correct, Counsel?
>
> MR. MAKNOON: Yes, Your Honor.

Id., p. 12. In addition to confirming Defendant's understanding of the maximum sentence the Court could impose, the Court also confirmed the type and quantity of drugs for which Defendant was admitting responsibility, and that he understood his base offense level was to be raised by two levels:

> THE COURT: I wish to confirm that the parties have stipulated that the type and quantity of controlled substance attributable to this Defendant in this case for the purposes of 2D1.1 of the sentencing guidelines is 75 grams of cocaine, 30 grams of heroin and 60 grams of cocaine base in the form commonly known as crack, for a converted drug weight of 259 kilograms. Is that correct?
>
> MS. GOODMAN: That's correct, Your Honor.
>
> THE COURT: Correct?
>
> MR. MAKNOON: Yes, Your Honor.
>
> THE COURT: Correct, sir?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Am I correct that the parties further agree that the adjusted base offense level should be raised by a total of two levels under Section 2D1.1(b)(1) of the sentencing guidelines for a dangerous weapon; correct?
>
> MS. GOODMAN: Yes, Your Honor.
>
> THE COURT: Correct?
>
> MR. MAKNOON: Yes, Your Honor.
>
> THE COURT: Correct?

THE DEFENDANT: Yes, sir.

Id., p. 12-13.

The next portion of the plea hearing covered Defendant's understanding of the

application of the advisory guidelines as follows:

THE COURT: Do you understand I'm required to consider the guidelines
adopted by the United States Sentencing Commission before reaching an
appropriate sentence, but that those guidelines are advisory and not
binding on this Court?

THE DEFENDANT: Yes, sir.

THE COURT: Have you and your attorney discussed how the guidelines
might apply in your case?

THE DEFENDANT: Yes, sir.

THE COURT: Is that correct, Counsel?

MR. MAKNOON: Yes, Your Honor.

THE COURT: Do you understand the Court will not be able to determine
your advisory guideline sentence until after I review the Presentence
Investigation Report, and you and the Government have had an
opportunity to challenge the reported facts and the Probation Office's
application and calculation of the guidelines? Understand?

THE DEFENDANT: Yes, sir.

THE COURT: What is the Government's position as to the applicable
advisory guideline range, please?

MS. GOODMAN: Your Honor, we have a pre-plea Presentence
Investigation Report in this case, and the Probation Office determined that
the Defendant is a career offender. The career offender offense level is 34.
With three points for acceptance of responsibility, that becomes a 31. And
the Defendant is a criminal history category of VI. The guideline range is
188 to 235 months imprisonment.

THE COURT: Agreed? You can remain seated. Do you agree?

MR. MAKNOON: Yes. Yes, we agree, but also to -- I've had a
conversation with my client -- at that time when the Presentence

Investigation Report comes down, to assess that as well. But we have looked at it.

THE COURT: Okay. Have you had adequate time to discuss the applicable advisory guideline range and that process with your counsel?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand what the Government's counsel just said about the possible applicable advisory guideline range?

THE DEFENDANT: Yes, sir.

THE COURT: And you realize it's **<u>above</u>** the number of months mentioned as the minimum in your Rule 11(c)(1)(C) stipulated sentence?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that after your initial advisory guideline range is determined, the Court has authority in some circumstances to depart upwards or downwards from that range, and the Court will also examine other statutory sentencing factors under Title 18 United States Code Section 3553(a) that may result in the imposition of a sentence that is either greater or lesser than the advisory guideline sentence?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that you or the Government have the right to appeal any sentence that I impose unless you voluntarily give up that right?

THE DEFENDANT: Yes, sir.

*       *       *

THE COURT: Do you understand the possible consequences of your guilty plea that I've reviewed with you in detail this morning?

THE DEFENDANT: Yes, sir.

Id., p. 12-15 (emphasis added).

Next, the Court discussed the specific details of Defendant's 2019 Plea Agreement with

Defendant to ensure that he understood its terms. The discussion went as follows:

THE COURT: I direct your attention to page 6 of the original plea agreement, which has been marked at Government's Exhibit No. 1. Is that your signature on page 6?

THE DEFENDANT: Yes, sir.

THE COURT: Counsel, your signature?

MR. MAKNOON: Yes, Your Honor.

THE COURT: Did you read and review the entire agreement with your counsel before you signed it?

THE DEFENDANT: Yes. I did.

THE COURT: Do you understand all its terms and contents?

THE DEFENDANT: Yes, sir.

THE COURT: Are there any other agreements or understandings with the United States Government that are not set forth in the plea agreement?

THE DEFENDANT: I don't think so, sir, no.

THE COURT: Well, why don't you talk to your counsel so you can give me a definite yes or no, please. (Private discussion between Defendant and defense counsel.)

THE COURT: Did you have adequate time to talk to your attorney about that question?

THE DEFENDANT: Yes, I did, sir.

THE COURT: Are there any other agreements or understandings with the United States Government that are not set forth in the plea agreement?

THE DEFENDANT: No.

THE COURT: I've reviewed with you previously the Rule 11(c)(1)(C) minimum term of imprisonment. Do you understand that, if I accept your guilty plea, that you'll be sentenced in accordance with the terms of your plea agreement, including the Rule 11(c)(1)(C) minimum term of imprisonment of not less than ten years?

THE DEFENDANT: Yes, sir.

THE COURT: If the Court rejects your plea agreement, you'll be advised in open court and given the opportunity to withdraw your guilty plea. In that event you could continue to plead guilty without an agreement. Do you understand the Court may reject your plea agreement?

THE DEFENDANT: Yes, sir.

THE COURT: On the other hand, if I accept your plea agreement, the Probation Office will prepare a Presentence Investigation Report and recommendation of sentence for the Court's review, and you'll be interviewed by the Probation Office in order to calculate an appropriate advisory sentence under the guidelines. Understand?

THE DEFENDANT: Yes, sir.

THE COURT: Has anyone made any promise or assurance to you that is not in the plea agreement to persuade you to accept this agreement?

THE DEFENDANT: No, sir.

THE COURT: Has anyone threatened you in any way to persuade you to accept this agreement?

THE DEFENDANT: No, sir.

THE COURT: Except for what is in the plea agreement, has anyone predicted or promised to you what your actual sentence will be?

THE DEFENDANT: No, sir.

THE COURT: Has anything I've said here today suggested to you what your actual sentence will be?

THE DEFENDANT: No.

THE COURT: Has anyone told you not to tell the truth or respond untruthfully to any question?

THE DEFENDANT: No, sir.

THE COURT: On behalf of the Government, would you please place on the record the elements of the offenses to which the Defendant is pleading guilty?

MS. GOODMAN: Yes, Your Honor.

Id., p. 15-19.

After placing the elements of the offenses on the record, the Court asked counsel for the

Government to summarize the evidence the Government would use to prove each of the offenses

to which Defendant was pleading guilty.  The Government's attorney indicated in relevant part:

> MS. GOODMAN: Yes, Your Honor. The Government's evidence at trial
> would have shown that in 2017, the FBI and the DEA initiated a wiretap
> investigation primarily targeting the GBK street gang and drug trafficking
> in and around an area known as the Greenway Projects located in the West
> End of the City of Pittsburgh.
>
> Monta Banks was an original target of the investigation. And on
> January 25, 2018, agents used a confidential source to make a controlled
> purchase from the Defendant.
>
> During the controlled buy, at the direction and under the
> supervision of agents, the confidential source contacted the Defendant at
> phone number 724-810-1045, which later became Target Telephone No. 2
> in the wiretap investigation, and arranged to purchase a quantity of heroin.
>
> The confidential source met with the Defendant and exchanged
> $120 for two bundles of controlled substance, which was subsequently
> tested by the DEA lab and was determined to contain .358 grams of a
> mixture of heroin and other controlled substances as charged in the
> superseding indictment.
>
> That controlled buy, along with additional information, was used
> to establish probable cause for the issuance of wiretaps on two phones
> used by Monta Banks and two phones used by co-conspirator Jewell Hall.
>
> During the wiretap investigation, the Defendant was intercepted
> over his own wiretapped phone lines and over the wiretapped phone lines
> of Jewell Hall. The interception of wire and electronic communications
> began in February 2018 and continued through June 2018.
>
> The Government's investigation revealed that in this conspiracy,
> Monta Banks conspired with his co-conspirators to traffic heroin, powder
> cocaine and crack cocaine. The investigation revealed that co-conspirator
> Lawrence Morrison was a source of supply of powder cocaine for Banks,
> which co-conspirator Ray Chrzanowski cooked into crack cocaine for
> Banks.
>
> Banks also obtained a supply of crack cocaine from co-conspirator
> Jewell Hall. Banks had various sources of supply for heroin, which he
> further distributed to numerous customers.
>
> At trial[,] the Government would have admitted into evidence
> hundreds of intercepted calls and text messages revealing incriminating
> communications between Monta Banks and others concerning drug
> trafficking.

For example, on March 17, 2018, at approximately 1:33 p.m., Monta Banks called Jewell Hall and asked if Hall was at, quote, "the store," end quote, meaning an apartment located in the Greenway Projects which the conspirators referred to as "the store."

Hall said that he wasn't. Banks then asked if Hall's "girl" was there, referring to co-conspirator Mardeja Chapple, who managed the store in Greenway. Hall responded, quote, "I just set it up there real quick," end quote, meaning that Hall had set out a quantity of crack cocaine for Banks. Banks asked, quote, "One's here for me?" End quote. Hall replied, quote, "Yeah, no doubt," end quote, meaning that Hall had agreed to sell one eight ball or 3.5 grams of crack cocaine to Banks.

Hall then warned Banks, quote, "Be careful, man. You know they swore me," end quote, meaning that law enforcement was all over Greenway, which revealed the illicit nature of the transaction between Hall and Banks.

Corroborating the intercepted communications, pole camera surveillance footage revealed that at 1:34 p.m., Banks, in fact, pulled into the parking lot in a gray Cadillac and entered the front door of the store, which was located at 795 Woodlow Street in the Greenway Projects. Roughly three minutes later Banks walked out of the store, reentered his car and left.

In addition to crack cocaine, during the investigation[,] Banks also obtained supplies of powder cocaine from co-conspirator Lawrence Morrison.

For example, on March 27, 2018, at approximately 7:00 p.m., Banks texted Morrison, quote, "Bro, you on deck with more?" end quote.

Morrison responded, quote, "He said a hour, bro. I'm waiting two," end quote. In these text communications Banks asked Morrison whether he had a quantity of cocaine. Morrison said that his supplier said that he would be about an hour.

Banks then communicated with co-conspirator Ray Chrzanowski to see if Chrzanowski was available to cook Morrison's cocaine into crack for Banks. At approximately 8:11 p.m. Chrzanowski called Banks and told Banks that he would be at Banks's location in about 30 minutes.

Banks responded, quote, "All right. He's on deck. I want to make sure I'm on point," end quote, meaning that Morrison would be coming with cocaine, and Banks wanted to make sure that he was ready for it.

Chrzanowski asked, quote, "Oh, we got to go somewhere?" end quote.

Banks responds, quote, "Nah, we just got to go back to the house so we can, you know, hit the microwave," end quote. Chrzanowski says, "Okay."

At trial the Government's evidence would have shown that in this call, Chrzanowski was on his way to meet up with Banks for the purpose of cooking the powder cocaine into crack or, as Banks refers to it, "hitting the microwave."

Banks and Lawrence Morrison then communicated several more times throughout that evening to finalize the deal.

Finally, at approximately 9:18 p.m. Banks texted Morrison, quote, "Bro, I'll be at the spot in ten," end quote. Morrison responded, quote, "On my way," end quote.

While cooking and distributing crack cocaine, Banks also distributed heroin. For example, on the very next day, March 28, 2018, at approximately 4:54 p.m., co-conspirator Eric Kaminski texted Banks, asking, quote, "How many for 40?" end quote. In this text message, Kaminski was asking Banks how many stamp bags of heroin he could get for $40.

Banks responds, quote, "Bun. Come to Rocks," end quote, telling Kaminski that he would sell him one bundle or ten stamp bags of heroin for $40 and that Kaminski should meet him in McKees Rocks.

At 5:39 p.m. Kaminski called Banks and asked where he wanted to meet. Banks told him to turn on 2nd and park at the top of the hill and walk around the corner to the door. Kaminski tells Banks that he is coming.

At approximately 5:41 p.m., agents conducting surveillance observed Kaminski walk up to the front door of 211 Bruce Street in McKees Rocks, a known residence of Monta Banks and enter the house. Within one minute, agents observed Kaminski exit the house.

At 5:44 p.m., Banks called Kaminski, and Kaminski told Banks that he suspected that surveillance was being conducted, saying, quote, "Yeah, I could have sworn I thought I seen someone in there," end quote.

Banks asked, quote, "Yeah, like he was trying not to be seen?" End quote.

Kaminski responded, quote, "Yeah. It was really tinted or something, like -- I don't know," end quote.

Kaminski asked Banks if he should go to Family Dollar or something. Banks tells Kaminski to ask his ride to pick him up and see if they get pulled over and then meet Banks at Greenway.

The agents conducting surveillance then observed Kaminski walk by -- walk towards a nearby Family Dollar store and get into a black Mazda being driven by another person. The Mazda then drove in the direction of the Greenway Projects.

This call reveals that Kaminski had spotted the agents conducting surveillance. The concern of Kaminski and Banks regarding the suspected surveillance reveals the illegal nature of their transactions.

Based upon information obtained through the intercepted communications, seizures of controlled substances, and through information provided by informants and cooperators, at trial and at sentencing the United States would have been able to prove beyond a reasonable doubt that during the charged timeframe, the quantity of cocaine and crack cocaine, both Schedule II controlled substances, and heroin, a Schedule I controlled substance, attributable to the Defendant,

including all relevant conduct, was at least 75 grams of cocaine, 30 grams of heroin and 60 grams of cocaine base in the form commonly known as crack, for a converted drug weight of 259 kilograms.

At trial the Government would have presented evidence to show that the Defendant possessed the controlled substances with the intent to distribute to others and did knowingly distribute controlled substances to others during the charged timeframe.

Additionally, the parties have agreed that the Defendant's base offense level should be increased by two levels pursuant to Section 2D1.1(b) of the guidelines based upon the Defendant's possession of a Taurus revolver .45 LC, which was recovered by law enforcement on April 26, 2018, and the Defendant has agreed to forfeit that revolver and related ammunition.

And that is a summary of the Government's evidence, Your Honor.

Id., p. 19-27.

In light of the voluminous evidence presented by Government which could be used to prove Defendant's guilt, the Court asked Defendant the following series of questions, which Defendant answered under oath:

THE COURT: Sir, in a moment I will ask you whether you agree with the Government's summary of what you did, but first, do you understand that your answers may be later used against you in a prosecution for perjury or making a false statement if you do not answer truthfully?

THE DEFENDANT: Yes, sir.

THE COURT: Do you agree with the prosecution's summary of what you did?

THE DEFENDANT: Yes, sir.

THE COURT: Are there any additions or corrections you wish to make?

THE DEFENDANT: No, sir.

THE COURT: The Court finds there's a factual basis to accept Defendant's plea of guilty to the offenses charged in the superseding indictment. Having been advised of all your [trial] rights, do you still intend to plead guilty today?

THE DEFENDANT: Yes, sir.

THE COURT: Counsel, is that consistent with your advice?

MR. MAKNOON: Yes, Your Honor.

THE COURT: Has anyone forced you in any way to enter a plea of guilty to these charges?

THE DEFENDANT: No, sir.

THE COURT: Did you make this decision to plead guilty of your own free will and voluntarily?

THE DEFENDANT: Yes, sir.

THE COURT: Did you understand everything I've discussed with you today?

THE DEFENDANT: Yes, sir.

THE COURT: Have you ever had any physical or mental illness that affects your ability to understand these proceedings or my explanation of your rights?

THE DEFENDANT: No, sir.

THE COURT: Counsel, do you have any doubt about the Defendant's competency to plead guilty?

MR. MAKNOON: No, Your Honor.

THE COURT: Are you completely satisfied with your attorney's advice and representation?

THE DEFENDANT: Yes, I am.

THE COURT: Has he done everything you've asked him to do?

THE DEFENDANT: Yes, sir.

THE COURT: Has he done everything that you believe he should not have done?

THE DEFENDANT: No, sir.

Id., p. 27-29.

Following this exchange, the Court asked counsel for the Government to summarize the most important terms of the 2019 Plea Agreement, noting that the firearm stipulation, the drug type and quantity stipulation, and the stipulated term of imprisonment in accordance with Rule 11 (c)(1)(C) had already been thoroughly discussed.  After Government's attorney recited those terms and following an off-the-record sidebar, the Court once again inquired about any other plea offers.

> THE COURT: Other than the plea agreement that's been presented today, did the Government tender to counsel for the Defendant any other formal plea offer?
>
> MS. GOODMAN: Your Honor, there was one prior formal plea agreement tendered by the United States to the Defendant that was to his prior counsel, and that was prior to the time of the superseding indictment. After the return of the superseding indictment, the Government tendered to the Defendant the current plea agreement, which is dated November 15, 2019.
>
> THE COURT: Counsel, did you receive any formal plea offer from the Government that you did not communicate to the Defendant?
>
> MR. MAKNOON: No, Your Honor.
>
> THE COURT: Was the Government's summary an accurate summary of the terms of the plea agreement?
>
> MR. MAKNOON: Yes, sir.
>
> THE COURT: Agreed?
>
> THE DEFENDANT: Yes, sir.

Id., p. 31-32.

Finally, the Court addressed the appellate rights and collateral attack waivers Defendant would be agreeing by pleading guilty to the charges.  In this regard, the exchange between the Court and Defendant went as follows:

> THE COURT: Do you understand that in the plea agreement you're giving up your right to appeal both the validity of your plea and legality of your

sentence with only three limited exceptions? You may file an appeal from the judgment and sentence of the Court only, one, if the United States files an appeal from the sentence or; two, if the sentence exceeds the applicable statutory limits set forth in the United States Code; or, three, the sentence unreasonably exceeds the applicable advisory guideline range under the United States Sentencing Guidelines. Understand?

THE DEFENDANT: Yes, sir.

THE COURT: Do you further understand that nothing in your waiver of appellate rights, as set forth in the plea agreement, shall preclude you from raising a claim of ineffective assistance of counsel in the appropriate forum?

THE DEFENDANT: Yes, sir.

THE COURT: On the other hand, do you understand that the Government retains its right to oppose any such claim on procedural or substantive grounds?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that you're giving up your right to appeal, including that you're waiving your right to file a motion to vacate sentence under Title 28 United States Code Section 2255, except as I've stated?

THE DEFENDANT: Yes, sir.

Id., p. 31-32.

Before the Court took Defendant's plea to the offenses charged, the Court again asked

Defendant if he had testified truthfully during the hearing:

THE COURT: Have you answered truthfully all the questions I've asked you today?

THE DEFENDANT: Yes, sir.

Id., p. 34.  After taking Defendant's plea of guilty to each of the offenses listed in his plea

agreement the Court made the following findings:

THE COURT: The Court finds that you're competent, that you know and understand your right to a jury trial and the consequences of waiving that

20

right, and that you know the maximum penalties for the offenses charged. The Court, therefore, approves the plea agreement, accepts your guilty pleas, and finds you guilty of the offenses for which you have pled guilty.

The Court will also sentence you in accordance with the stipulated sentence contained in the plea agreement.

Sir, I'm holding up before you a Change of Plea form relating to Counts 4, 5 and 7 and a lesser included offense at Count 3. Is that your signature, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Counsel, your signature?

MR. MAKNOON: Yes, Your Honor.

Id., p. 36.

### C.  Events Which Occurred After Defendant's Plea Hearing, But Before His Sentencing Hearing

Following Defendant's Change of Plea hearing held on December 11, 2019, Defendant filed several motions, some on his own, and others through his attorneys.[3]  These motions were all filed after the final presentence investigation report was filed on April 25, 2020.

Of relevance here, is the motion filed by Defendant on August 19, 2020, seeking to withdraw his guilty plea.  ECF 1170.  The Court denied Defendant's *pro se* motion to withdraw his guilty plea, seeking transfer from a state facility to a federal facility (ECF 1174), but ordered Defendant's attorney to meet with Defendant and to file any counseled motion (if appropriate) after the doing so.

On August 28, 2020, after meeting with Defendant, Attorney Maknoon filed a motion to withdraw Defendant's guilty plea and a separate order seeking a transfer for his client from the Allegheny County Jail ("ACJ") to NEOCC, a federally funded institution, claiming he was not given enough time in the computer room at ACJ to review his discovery materials. ECF 1181

---

[3] After Defendant pled guilty, Attorney Frick replaced Attorney Maknoon as Defendant's attorney.

and ECF 1182, respectively. In his motion to withdraw Defendant's guilty plea, Attorney

Maknoon argued that Defendant was now asserting his innocence to the offenses charged, and

claimed Defendant "misunderstood": (1) the impact/implications of the Government having

changed the offense at Count 7 from 21 U.S.C. § 841(b)(1)(b) to 21 U.S.C. § 841(b)(1)(c);

(2) the effect of the Government filing an 851 Notice on the 21 U.S.C. § 841(b)(1)(c) offense

rather than the prior charge of 21 U.S.C. § 841(b)(1)(b); (3) the impact/implications of the Fair

Sentencing Act and First Step Act on his sentencing guidelines; (4) the dangerous weapon

enhancement pursuant to 2D1.1; (5) his designation as a career offender; and (6) his waiver of

appellate rights. ECF 1181.

After the Government filed its omnibus response to both motions (ECF 1194), the Court

denied both Motions. ECF 1201.  Specifically, with respect to Defendant's motion to withdraw

his guilty plea, the Court's opinion reads, in relevant part, as follows:

> In the instant matter, Defendant bears the burden of proving to this Court
> that he has a fair and just reason for requesting the withdrawal of his guilty
> plea. As noted above, the Court of Appeals for the Third Circuit suggests
> that when deciding if Defendant adequately demonstrated a "fair and just
> reason" to withdraw his plea, this Court must consider: (1) whether
> Defendant is now asserting his innocence; (2) the strength of Defendant's
> reasons for withdrawing his guilty plea; and (3) whether the Government
> will be prejudiced by the withdrawal of Defendant's guilty plea. The Court
> begins its analysis by first noting that during the Change of Plea Hearing
> held on December 11, 2019, Defendant was asked twice if he understood
> that having been sworn, his answers were subject to the penalties of
> perjury if he did not answer the Court's questions truthfully. ECF 1184, p.
> 2-3 and p. 27-28. Twice Defendant told the Court that he understood if he
> did not tell the truth he could be subject to the penalties of perjury. Id.
> Defendant's instant Motion to Withdraw Guilty Plea asserts that
> Defendant is innocent. ECF 1181, p. 2. In addition, Defendant contends
> that he has or had "misunderstandings" about his plea agreement. Id.
>
> *     *     *
>
> The Government argues that Defendant's instant assertion of innocence
> cannot be taken seriously. During the Change of Plea hearing, the

Government provided a summary of Defendant's offenses. During the Government's recitation of the offense conduct, the Government provided specific details concerning intercepted wiretap calls, intercepted text messages, observations of Defendant made by law enforcement while Defendant was under surveillance, and Defendant's actual participation in at least one controlled buy of narcotics made directly by Defendant. See Plea Hearing Transcript at ECF 1184. The Court asked Defendant during the plea hearing if he agreed with the Government's recitation "of what [he] did" and the Defendant testified, under oath, with his counsel present that he did agree with the summary of his crimes as described by the Government. Id. at 27-28. Accordingly, this Court finds that Defendant's Motion does not meet his burden of proving that he is innocent.

Next, Defendant contends that he has or had "misunderstandings" about his plea agreement. Defendant believes these misunderstandings lend strength to his argument that he be allowed to withdraw his guilty plea. This Court disagrees. First, the Court notes that Defendant completed high school and attended one and one-half years of college. Next, on the day of the plea hearing Defendant testified that he had not taken any drugs or alcohol into his body in the 48 hours before the hearing. Thus, Defendant was capable of understanding the proceeding that day. Finally, as noted by the Government, and as the Plea Hearing transcript reflects, Defendant repeatedly indicated that he understood everything that was happening during his Change of Plea Hearing.

ECF 1201.

The Court's opinion then quoted much of the plea hearing transcript in the same manner as herein.  See subsection "B." above.  After reiterating relevant portions from Defendant's change of plea colloquy, the Court then addressed each of Defendant's six specific reasons he wanted to withdraw his guilty plea, noting as follows:

First, Defendant claims that the Government "changed the offense at Count 7 from 21 U.S.C. § 841(b)(1)(b) [sic] to 21 U.S.C. § 841(b)(1)(c) [sic]." Count 7 was not charged in the original indictment; rather, it was charged in the superseding indictment (See Doc. No. 3). Therefore, the only "change" relating to Count 7 was that it was charged for the first time in the superseding indictment. In light of the dialog that took place between this Court and Defendant during Defendant's Change of Plea Hearing, Defendant's alleged misunderstanding fails to provide an adequate reason to allow Defendant to withdraw his plea.

23

Next, Defendant claims he misunderstood the effect of the Government filing an 851 Notice on the 21 U.S.C. § 841(b)(1)(C) offense rather than the 21 U.S.C. § 841(b)(1)(B) offense, and alleges that this misunderstanding has caused him to want to withdraw his guilty plea. The Court concurs with the Government's explanation of the impact of the 851 Notice as set forth in its submission. See ECF 1194, p. 28-29. Simply put, the terms of Defendant's 11(c)(1)(C) plea agreement indicate that Defendant agreed to a minimum sentence of 10 years imprisonment. If Defendant had pled guilty without the benefit of this plea agreement, Count 1 (which charges Defendant with violating 21 U.S.C. § 841(b)(1)(A)) would have placed a mandatory minimum of 15 years imprisonment on Defendant with the filing of the 851 Notice. If Defendant had pled guilty to Count 3 (which charges Defendant with violating 21 U.S.C. § 841(b)(1)(B)) without the benefit of this plea agreement – which enabled Defendant to plead guilty to a lesser included offense at Count 3 – Defendant would face a mandatory minimum term of 10 years; but, he would have had a higher career offender offense level of 37 with an advisory guideline range of 360 months to life imprisonment. Because of the plea agreement, the Government and Defendant stipulated to an offense level of 31 with an advisory guideline range of 188 to 235 months imprisonment. Therefore, given the advantageous terms of this Rule 11(c)(1)(C) plea agreement, Defendant's argument relating to the 851 Notice are a non-issue.

Third, the impact of the Fair Sentencing Act and First Step Act are likewise of no moment for the reasons set forth above.

Fourth, Defendant claims he misunderstood the "dangerous weapon enhancement pursuant to 2D1.1." While this enhancement affects Defendant's offense level, the enhancement does not impact Defendant's guideline range because Defendant is deemed to be a career offender. Accordingly, Defendant's calculations are performed in accordance with section 4B of the United States Sentencing Guidelines. Whether or not Defendant misunderstood whether Section 2D or 4B applied in this case, it does not have any bearing on Defendant's advisory guideline range. Therefore, this argument does not persuade the Court to allow Defendant to withdraw his guilty plea.

Fifth, Defendant claims to have misunderstood "his designation as a career offender." Defendant objected to this designation when the Presentence Investigation Report was issued. ECF 1129. The United States Probation Office filed an Addendum to the Presentence Investigation Report explaining its decision to apply the career offender designation to Defendant. ECF 1130. Defendant has not provided this Court with any authority which would allow for the withdrawal of a guilty plea due to a determination made by the United States Probation Office (which this

> Court has not yet accepted), designating Defendant as a career offender. In
> addition, it is notable that even if Defendant were to withdraw his plea and
> go to trial, the United States Probation Office would not change its
> position on its designation of Defendant as a career offender. Thus, the
> Court will not allow defendant to withdraw his guilty plea for this reason.
>
> Finally, Defendant claims to have misunderstood "[h]is waiver of
> appellate rights." During the Change of Plea Hearing, this Court asked
> Defendant if he understood the terms of his plea agreement, which
> contained a waiver of his appellate rights, (ECF 1184, p. 16) and
> specifically reviewed the waiver of his appellate right[s] with him. Id., p.
> 33. This Court finds that Defendant knew and understood the appellate
> rights he was foregoing, and thus, declines to allow Defendant to
> withdraw his guilty plea for this reason.

Id.

On September 25, 2020, shortly after the Court issued this Order denying Defendant's

motion to withdraw his guilty plea, Attorney Maknoon filed a motion to withdraw as

Defendant's counsel claiming he and Defendant had irreconcilable differences.  ECF 1206.  The

Court granted Attorney Maknoon's motion to withdraw as counsel (ECF 1213), and appointed

Attorney Sally Frick to serve as counsel to Defendant. ECF 1214.

While represented by Attorney Maknoon, and later Attorney Frick, Defendant filed six

additional motions with this Court, all of which sought to essentially relitigate the Court's

decision to deny Defendant's motion to withdraw his guilty plea.  ECF 1209, ECF 1274, ECF

1275, ECF 1292, ECF 1296, and ECF 1317.  The Court denied all of these motions.  ECF 1281,

and ECF 1436.

On April 4, 2021, Defendant filed a motion seeking to have Attorney Frick removed as

his counsel.  ECF 1436.  This motion was denied as moot by the Court after the Court held a

status conference and Defendant admitted that he was satisfied with Attorney Frick's

representation.  ECF 1565.

On May 7, 2021, Attorney Frick filed an amended motion to withdraw Defendant's guilty plea which argued that Defendant should be permitted to withdraw his plea due a change in the law affecting his career offender status. ECF 1451. Denying Defendant's second attempt to withdraw his guilty plea, this Court stated:

> Defendant is correct that his present and past inchoate crimes of conspiracy are not controlled substance crimes under *Nasir*, and thus, do not contribute to his career offender designation. Therefore, the sections of Defendant's presentence investigation report which suggest that Defendant is a career offender due to his past and present crimes of conspiracy may not be used to establish his career offender status under *Nasir*. However, based on Defendant's criminal history set forth in the "Criminal History" section of his presentence investigation report, it appears as though Defendant has had three prior felony convictions for possession of a controlled substance, and he pled guilty in this case to a possession charge making the instant offense a controlled substance offense. ECF 1057. Therefore, because of his past and present convictions for possession, Defendant meets the criteria for a career offender designation.
>
> Accordingly, although there has been a change in the law through the *Nasir* decision, Defendant still meets the criteria for a career offender designation and thus, his second request to withdraw his guilty plea is DENIED.

ECF 1464.

In June of 2020, Defendant filed a counseled set of objections to his Final Presentence Investigation Report ("PSR"), challenging the portion of the report which labeled him a career offender. ECF 1129.

On May 19, 2021, the Court filed tentative findings of fact and conclusions of law on the matter finding that the probation office had correctly determined that Defendant was a career offender for the following reasons:

> The United States Sentencing Guidelines indicate that Defendant is considered to be a "career offender" if: (1) Defendant was at least 18 years old at the time he committed the instant offense; (2) the instant offense is a felony that is either a crime of violence or a controlled substance offense;

and (3) Defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. U.S.S.G. § 4B1.1. Based on Defendant's criminal history, Defendant has three prior felony convictions for possession of a controlled substance, and he pled guilty in this case to a possession charge making the instant offense a controlled substance offense. Therefore, Defendant meets the criteria for a career offender.

Thus, the Court tentatively finds that the *Nasir* decision does not apply to Defendant because he was convicted of three prior choate crimes – possession of a controlled substance – and he has now pled guilty to his fourth possession charge. Although Defendant also pled guilty to three counts of conspiracy (an inchoate crime) in the instant case, and has also been convicted of conspiracy in the past, this does nothing to negate the application of the career offender sentencing designation. Thus, the Court tentatively finds that Defendant will be sentenced with a criminal history score of VI due to his career offender status.

ECF 1463.

On June 15, 2020, the Court sentenced Defendant in accordance with his stipulated plea agreement -- and as a career offender -- to concurrent terms of 150 months imprisonment at Counts 3, 4, 5, and 7.  Defendant was also sentenced to 6 years of supervised release (to be served concurrently) upon his release from prison.  At the end of the hearing, the Court granted the Government's motion to withdraw Counts 1 and 8 of the superseding indicment.

Notably, Defendant's 150-month term of imprisonment was below his guideline range of 188-235 months imprisonment, which was based on an offense level of 31, and a criminal history score of VI.  ECF 1498.

**D. Actions Taken After Defendant's Sentencing Hearing**

Immediately following Defendant's sentencing hearing, Attorney Frick made an oral motion to withdraw as Defendant's counsel, which this Court granted.  ECF 1499 and ECF 1500. Defendant appealed his Judgment on June 15, 2020 – the same day he was sentenced.  ECF 1502.  The United States Court of Appeals for the Third Circuit summarily affirmed Defendant's

conviction and dismissed his appeal based on the waiver of appeal language contained in Defendant's 2019 Plea Agreement.  ECF 1607.  On November 5, 2021, the Court of Appeals filed its Mandate with this Court on the matter.  Id. Defendant did not file a Writ of Certiorari with the United States Supreme Court.

Currently, Defendant is incarcerated at FCI Williamsburg, and on July 5, 2022 he timely filed the instant 2255 petition, *pro se*.  ECF 1707.  Defendant simultaneously filed a motion to appoint counsel and a motion to proceed *in forma pauperis*. ECF 1708 and ECF 1709.[4]

This Court provided Defendant with a *Miller* Notice on August 4, 2022 which explained Defendant's options relative to his 2255 motion.  ECF 1723.  On August 11, 2022, Defendant indicated that he opted to proceed on his original motion (the motion filed at ECF 1707), and asked the Court to disregard a secondary filing he made at ECF 1719.  ECF 1728.  The Government filed a Response (ECF 1773), and on January 31, 2023, Defendant filed a Reply to the Response, making the matter ripe for adjudication.  ECF 1797.

### II. Standard of Review

#### A.  In General

A Section 2255 petition enables a defendant to petition the court that imposed the sentence, collaterally attacking a sentence imposed after a conviction. 28 U.S.C.A. §2255; see also *U.S. v. Cannistraro*, 734 F.Supp. 1110, 1119 (D.N.J. 1989), *aff'd*, 919 F.2d 133 (3d Cir. 1990), *cert. den'd*, 500 U.S. 916 (1991).  Pursuant to 28 U.S.C. § 2255, a federal prisoner may

---

[4] The Court notes that Defendant's conviction became final on January 12, 2022.  This date represents the ninety days Defendant had to file a Writ of Certiorari from the date the Court of Appeals entered its judgment.  Because Defendant filed the instant 2255 petition sometime between June 28 and June 30 of 2022, he is within a year of January 12, 2022, thus making his 2255 petition timely.  In addition, the Court will address Defendant's other two motions filed at ECF 1708 and ECF 1709 (his motion to appoint counsel and his motion to proceed in forma pauperis, respectively) within this Memorandum Opinion. See section II. C., infra.

move the sentencing court to vacate, set aside or correct a sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack . . . ." 28 U.S.C. § 2255. Relief is "generally available only in 'exceptional circumstances' to protect against a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." *U.S. v. Gordon*, 979 F.Supp. 337, 339 (E.D.Pa.1997) (citing *Hill v. U.S.*, 368 U.S. 424 (1962)).

The Court considers a defendant's petition together with all files, records, transcripts and correspondence relating to the judgment under attack.  See 28 U.S.C. § 2255.  A district court considering a Section 2255 petition accepts "'the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record,'" *U.S. v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005) (quoting *Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir.1989)).  The final disposition of a Section 2255 motion lies with the discretion of the trial judge, see *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985), and a district court may summarily dismiss a Section 2255 motion where the motion, files, and records "show conclusively that the movant is not entitled to relief." *U.S. v. Mason*, 2008 WL 938784, 1 (E.D.Pa.2008) (citing *Forte*, 865 F.2d at 62).

"Section 2255 generally may not be employed to relitigate questions which were raised and considered on direct appeal," *U.S. v. DeRewal*, 10 F.3d 100, 105 n. 4 (3d Cir.1993) (internal quotations omitted).  Moreover, "if a petitioner has failed to raise an objection at the time of trial and has also failed to raise the issue on direct appeal, then collateral review of that claim is procedurally barred unless the petitioner is able to show 'cause' excusing his procedural default

and 'actual prejudice' resulting from the alleged error or violation." *Henry v. U.S.*, 913 F.Supp. 334, 335 (M.D.Pa.1996). *See also U.S. v. Essig*, 10 F.3d 968, 979 (3d Cir.1993) (holding that the "cause and prejudice" standard set forth in *U.S. v. Frady*, 456 U.S. 152 (1982) "applies to § 2255 proceedings in which a petitioner seeks relief from alleged errors in connection with his sentence that he has not directly appealed").

### B. Specific Standard Applicable to Ineffective Counsel Claims

However, a petitioner need not demonstrate cause and prejudice when raising a claim of ineffective assistance of counsel for the first time in a collateral attack. *Massaro v. U.S.*, 538 U.S. 500, 504 (2003) (holding that an "ineffectiveness" claim can be brought in a collateral proceeding under § 2255 regardless of whether the same issue could have been addressed on direct appeal); *DeRewal*, 10 F.3d at 104.

The standard of review for a claim of ineffective assistance of counsel was set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). As the United States Court of Appeals for the Third Circuit in *United States v. Travillion*, 759 F.3d 281, 289 (3d Cir. 2014), further explained, in order to prove ineffective assistance of counsel, a defendant must first demonstrate that attorney's performance was deficient. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Secondly, the defendant must show that the attorney's deficient performance prejudiced the defense. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

Thus, to prove a valid claim in this case, Defendant must show both deficiency (his attorney's errors were so serious that his attorney failed to function as 'counsel' guaranteed to

the defendant by the Sixth Amendment), and prejudice (counsel's errors were so serious as to deprive the defendant of a fair trial).

### C. The Section 2255 Hearing

When a motion is made under 28 U.S.C. § 2255, the question of whether to order a hearing is committed to the sound discretion of the district court.  In exercising that discretion, the court must accept the truth of the petitioner's factual allegations unless they are clearly frivolous on the basis of the existing record. *United States v. Day*, 969 F.2d 39, 41–42 (3d Cir. 1992).  Further, the court must order an evidentiary hearing to determine the facts unless the motion and files and records of the case show conclusively that the petitioner is not entitled to relief.  *Id.*; *United States v. Gordon*, 979 F.Supp. 337, 339 (E.D. Pa.1997).

The Court finds no need for an evidentiary hearing, as the record herein conclusively establishes that Defendant is not entitled to the relief sought in his 2255 petition. 28 U.S.C. § 2255. Because no evidentiary hearing is needed, Defendant's request for counsel is likewise denied.  *United States v. Iasiello*, 166 F.3d 212, 213 (3d Cir. 1999).

### III. Analysis

#### A.  Ground 1: Defendant's Claim That Attorney Maknoon Was Ineffective for Failing to Communicate the 2018 Plea Offer or for Allowing the 2018 Plea Offer to Lapse

Defendant argues, alternatingly, that Attorney Maknoon failed to communicate the 2018 Plea Offer to him, and that Attorney Maknoon failed to communicate to Defendant that the 2018 Plea Offer had not expired.  ECF 1707.  Defendant also claims Attorney Maknoon allowed the 2018 Plea Offer to expire. Specifically, Defendant contends that he did not know the 2018 Plea Offer remained a viable offer, from the date it was shared with Attorney Maknoon on August 5, 2019, "through October 8, 2019."  ECF 1707-11.

In response to Defendant's arguments, the Government notes that the 2018 Plea Offer had no expiration date, and it was not withdrawn prior to the return of the superseding indictment in October of 2019.  ECF 1773, p.18.  The Government further notes that Defendant also claims to have rejected the 2018 Plea Offer (an allegation the Defendant disputes), which he could have only done if he had been made aware of the 2018 Plea Offer by his attorneys.

To show prejudice from Attorney Maknoon's alleged ineffective assistance of counsel for allowing the 2018 Plea Offer to lapse or be rejected, Defendant must demonstrate a reasonable probability: (1) "he would have accepted the earlier [2018] plea offer had [he] been afforded effective assistance of counsel[,]" and (2) "that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Missouri v. Frye*, 566 U.S. 134, 147 (2012) (emphasis added).

### 1. Proof Defendant would have accepted the 2018 Plea Offer if he had known it remained viable or his Attorney did not allow it to lapse

The Court begins its consideration on this issue by noting that Defendant was well aware of the 2018 Plea Offer in 2018 – not 2019, as his 2255 petition sometimes suggests.  Defendant's own affidavit attached to his Section 2255 petition illustrates this, as follows:

> In or around October 2018[,] Banks had an initial appearance with Attorney Neil Rothschild in which [he] pled not guilty. Through numerous visit[s] from Attorney [Rothschild,] he was notified that he [was] a career offender and is facing a lengthy sentence of 15 years in prison.  Banks couldn't fathom that amount of time based on his criminal records showing he did not have the actual 1 year and 1 month of imprisonment that qualifies a sentencing enhancement. He was told by Attorney Rothschild that the prosecutor had it out for him and if he doesn't submit to the plea bargain of 151-188 months[,] a floor of ten years to count 1-3 of the indictment[,] she (Tonya Goodman) may supersede the state charges that he faced.  Banks told his attorney he's not willing to be sentenced to that amount of time without proceeding to trial. Neil Rothschild stated the AUSA said the firearm in the state if convicted will be no less than 15 [years] because he would be under the ACCA.  Banks

> overall denied the plea offer in hope to benefit from the 1st Step Act of
> 2018 and proceed to trial. . . .

ECF 1707-1, p.1-2.

Based on the admissions set forth in Banks' own affidavit quoted above, the Court finds three facts to be true.  First, Defendant knew about the contents of the 2018 Plea Offer in 2018. Second, Defendant and his first attorney, Neil Rothschild, also discussed the fact that Defendant was a career offender (despite Defendant's erroneous belief that he could not be classified as such), during 2018.  Third, Defendant told Attorney Rothschild that he would prefer to go to trial as opposed to  pleading guilty and accepting a 10-year floor for an imprisonment term, thereby clearly signaling that Defendant declined the 2018 Plea Offer while being represented by Attorney Rothschild.

Thus, the Court finds that there is absolutely no merit to Defendant's claim that he was ignorant about the existence of the 2018 Plea Offer in 2018, and further finds that Attorney Rothschild informed Defendant of the specifics of the 2018 Plea Offer as well as the circumstances surrounding the 2018 Plea Offer (*i.e.,* Defendant's career criminal status, and his guideline range).

Next, based on Defendant's Section 2255 submissions, Defendant agrees with the following facts:

- Attorney Rothschild filed a motion to withdraw his appearance on behalf of Defendant on March 31, 2019, and on April 12, 2019, Attorney Maknoon was appointed to represent Defendant Banks.[5]

---

[5] Attorney Rothschild withdrew as Defendant's counsel citing irreconcilable differences, which arose when Defendant reported Attorney Rothschild to the Pennsylvania Disciplinary Board for failing to file a challenge to the grand jury proceeding at 18-cr-150.  The Disciplinary Board found the claim meritless and dismissed it.

- On May 10, 2019, a pre-plea investigation report was docketed for counsels' eyes only. This report contained Defendant's criminal history details and computation.

- On August 5, 2019, AUSA Goodman emailed a copy of the 2018 Plea Offer to Attorney Maknoon, along with a copy of the "851 Information," noting in the body of the email that Defendant was a career criminal, citing the pre-plea investigative report (docketed on May 10, 2019).  In this email, AUSA Goodman also indicated, "[i]n the attached plea agreement, Neil [Rothschild] was trying to get the Career Offender guideline down (which he accomplished through our agreement to a lesser-included offense).  In exchange we wanted to be sure that he would at least get 10 years (which is the purpose of the sentencing floor)."  ECF 1773-2.

- On October 18, 2019, Attorney Maknoon was appointed to represent Defendant Banks in the instant case (case number 18-cr-152), following the issuance of a superseding indictment in case number 18-cr-152, which listed Defendant as one of 23 co-defendants.[6]  ECF 675.

Specifically concurring with the above, Defendant's affidavit reads as follows:

> Banks was assigned Jon Komron Maknoon as defense counsel on [April 12, 2019]. The attorney made himself known on visit to the Allegheny County Jail.  Jon Maknoon asked Banks[,] "Do you wish to proceed to trial[?]" Banks told him, "He's not[,] not guilty, but he's not this big time drug dealer they're making him out to be and don't deserve 15 years. If they are asking for 15 years[,] then yes, he wishes to proceed to trial.["] . . . Over time Jon Maknoon came to visit Banks telling him that "former attorney Neil Rothschild has not forwarded the file as of yet. But he will ask for a reverse proffer allowing them[,] as a team[,] to see what the [AUSA] is expecting to do if we decide to proceed to trial and we will talk numbers."  Banks was on board as to discuss a plea or proceed to trial.

---

[6] On October 8, 2019, (the date the superseding indictment in case number 18-cr-152 was docketed), the six remaining defendants from case number 18-cr-150 (which included Defendant Banks) who had not yet pled guilty in case number 18-cr-150, were charged with their original 18-cr-150 offenses as well as additional offense(s) at case number 18-cr-152.  One of the new charges brought against Defendant Banks in case number 18-152 was possession of controlled substances.

> (Please be advised that "at no time" did Jon Maknoon inform Mr. Banks
> before the reverse proffer that the government re-extended the initial plea
> negotiated with Neil Rothschild[,] lowering the career offender
> designation.) . . .
>
> *    *    *
>
> Monta Banks was called to Court, without knowledge as to why, on
> November 15, 2019.  Arriving, he then found out it's an arraignment
> hearing for a superseding indictment [dated] October 8, 2019.  With no
> time to discuss nothing with Attorney Maknoon about the superseding
> indictment we had a reverse proffer meeting immediately after the
> hearing. . . . Banks and Attorney Maknoon had no adequate time to
> discuss the new charges or prepare . . .  for proper advocacy . . . at the
> reverse proffer meeting.

ECF 1707-1, p. 2-3.

Given the above statements prepared by Defendant and attached to his own 2255 petition,

Defendant and Attorney Maknoon discussed Defendant's personal belief that he did not deserve

to be imprisoned for 15 years because he was not a "big time drug dealer."  This is the same

sentiment Defendant seemingly communicated to Attorney Rothschild when the 2018 Plea Offer

was presented to Defendant by Attorney Rothschild, and rejected by Defendant.

Additionally, in another affidavit filed By Defendant in support of his 2255 petition,

Defendant wrote the following:

> . . . [AUSA] Goodman asked if Jon Maknoon received the file from
> former attorney suggesting Jon Maknoon to file a motion with [the Court]
> to order Neil Rothschild to turn his file over.  On October 2, 2019 10:41
> AM[,] Jon Maknoon considered himself handicapped and asked for a
> highlight disc/information and a "reverse proffer."  [AUSA] Goodman
> stated a highlight disc [was] a tall order but we can do a reverse proffer . . .
> [on] November 15, 2019.  Jon Maknoon did not discuss the potential plea
> with his client at all. Jon Maknoon was told by Banks that he doesn't feel
> he is a career offender and a plea was offered that lowered the career
> offender guideline in order for him to be sure to get 10 [years]. Had Jon
> Maknoon inform[ed] Banks of the plea bargain in a timely manner, giving
> him a chance to accept, deny or testify there would not have been a
> superseding indictment to induce a scare tactic to make Banks plead.

ECF 1707-11, p.1-2.

The above excerpts taken from Defendant's second affidavit in support of his Section 2255 Petition also refer to conversations Defendant was having with Attorney Maknoon about information contained in the 2018 Plea Offer, including specific details about Defendant's career offender status, and a floor of 10 years. Accordingly, Defendant's own statements set forth in ECF 1707-1 and ECF 1707-11 belie his assertion that he was ignorant about the continued existence of the 2018 Plea Offer from April 12, 2019, when Attorney Maknoon was first appointed to represent Banks and engaged in plea discussions with him, until October 8, 2019, the date the superseding indictment was filed in the instant case.

Because Defendant has failed to offer proof illustrating that Attorney Maknoon failed to inform Defendant of the continued existence of the 2018 Plea Offer and that Attorney Maknoon allowed the 2018 Plea Offer to lapse – to the contrary, the statements Defendant has provided to this Court prove the opposite.

> **2. The end result of the criminal process would not have been more favorable to Defendant because he would not have been sentenced to less prison time.**

Although the Court has found no evidence whatsoever that Attorney Maknoon failed to inform Defendant of the 2018 Plea Offer, and although there is no evidence that Attorney Maknoon "allowed" the 2018 Plea Offer to lapse, the Court also notes that Defendant failed to demonstrate how his acceptance of the 2018 Plea Offer, as opposed to the 2019 Plea Offer, would have been more favorable to Defendant. Both the 2018 and the 2019 Plea Offers required Defendant to serve a minimum of ten years imprisonment. Both the 2018 and the 2019 Plea Offers set forth a sentencing guideline range based upon Defendant's criminal history score of "VI," which was derived from Defendant's status as a career offender.

Defendant's attempt to muddy the waters by suggesting he was not a career offender at the time the 2018 Plea Offer was made, and was viable, is erroneous.  The 2018 Plea Offer required Defendant, who already had three prior drug offenses, to plead guilty to Counts 2 and 3 and a lesser-included offense at Count 1 – all charging conspiracy to possess with intent to distribute and distribute quantities of various illegal drugs.  Although on December 1, 2020, the day *United States v. Nasir,* 982 F.3d 144 (3d Cir. 2020) was decided, inchoate crimes, such as conspiracy, could no longer be considered as "controlled substance offenses," the state of the law during the entirety of the 2018 Plea Offer's viability was such that Defendant was properly identified as a career offender.  Therefore, even if Defendant had accepted (and pled guilty to) the 2018 Plea Offer (which he did not), he would have been classified as a career offender.

Moreover, it is clear from Defendant's own submissions/admissions that he and his first attorney, Neil Rothschild, discussed Defendant's career offender status when the 2018 Plea Offer was proffered.  Defendant's submissions/admissions also indicate that he discussed his incredulity that he could be classified as such.  His submission admissions further prove that Defendant continued these discussions and continued to express his incredulity with his second attorney, Attorney Maknoon, prior accepting the 2019 Plea Offer.

In addition, on December 11, 2019, the day that Defendant accepted the 2019 Plea Offer and pled guilty to the same three inchoate offenses noted above, as well as the additional crime of possession with intent to distribute and distribution of illegal substances, his status as a career offender remained unchanged.

Despite the fact that the *Nasir* decision altered the state of the law as of December 1, 2020, the state of the law during the viability of the 2018 Plea Offer was the same as the state of the law during the viability and acceptance of the 2019 Plea Offer.  Thus, under either Plea

37

Offer, Defendant was considered to be a career criminal.  Accordingly, under either Plea Offer, Defendant's sentencing guideline range was predicated upon the fact that his criminal history score was a "VI."

Based on the foregoing, Defendant has utterly failed to demonstrate to this Court that the end result of the criminal process would have been more favorable to him.  Defendant was going to be considered a career criminal under both the 2018 and 2019 Plea Offers, his criminal history score of "VI," which this Court considered along with all the other Section 3553 factors, would not have been reduced if he had taken the 2018 Plea Offer.

### 3. Additional ineffective "communication" claims advanced by Defendant

Defendant argues that there were other communication failures on the part of Attorney Maknoon which support his ineffective assistance of counsel claim.  He specifically contends that Attorney Maknoon failed to inform him of the additional offenses charged against him in the superseding indictment filed at 18-cr-0152.  Defendant also claims that Attorney Maknoon failed to obtain Attorney Rothschild's file and did not give Defendant sufficient time to prepare for plea negotiations.

This Court finds that each of Defendant's allegations are contradicted by the sworn testimony he provided at the change of plea hearing which this Court has set forth in the Factual and Procedural Background section of this Opinion. See Subpart "I.B.," above.

Finally, Defendant alleges that he received an oral offer from AUSA Goodman at the reverse proffer meeting he attended with Attorney Maknoon, and that the oral offer was identical to the formal, written 2018 Plea Offer.  He further contends that during the change of plea hearing, when he purportedly first learned that he was pleading guilty not only to the two counts of conspiracy and a lesser-included offense of conspiracy, but also a crime of possession, he

expressed his "high level of uneasiness" to Attorney Maknoon but was told by him to "be quiet."
ECF 1707-1, p. 7.

Defendant's argument in this regard is also meritless. Defendant had received a formal plea offer from the Government (the 2018 Plea Offer), and rejected same through Attorney Rothschild. Defendant was then charged with his original crimes and additional crimes by way of a superseding indictment. After Attorney Maknoon began to represent Defendant, Attorney Maknoon was given a copy of the 2018 Plea Offer, and he and Defendant discussed the fact that Defendant had rejected the 2018 Plea Offer because he was not the "big time drug dealer" that Government made him out to be. Defendant and Attorney Maknoon next attended a reverse proffer meeting Government presented the evidence it had against Defendant in relationship to the charges brought against him in the superseding indictment. This reverse proffer meeting formed the basis for the Government's second formal plea offer (the 2019 Plea Offer). However, until Defendant received the 2019 Plea Offer, in writing and signed by the United States Attorney for the Western District of Pennsylvania, he could not consider the reverse proffer discussions to be a formal Plea Offer.

Furthermore, during the Change of Plea Hearing, this Court asked Defendant, under oath, about any agreements or understandings with the Government which were not set forth in the 2019 Plea Agreement. Defendant answered that there were no understandings other than the initial plea offer (the 2018 Plea Offer) and the 2019 Plea Offer, which was the plea offer he accepted. Defendant's testimony set forth in section "I.B." above, illustrates the many different questions this Court asked to ensure Defendant understood the crimes to which he was pleading guilty, and whether he was "forced" to plead guilty or if he was pleading guilty of his "own free will and voluntarily." The answers provided by Defendant at the time of his change of plea

hearing convinced this Court that Defendant knew and understood the charges to which he was pleading guilty, and that he had opted to plead guilty to each of those charges of his own free will.

### 4. Conclusion

All evidence of record shows that Attorney Maknoon effectively communicated with Defendant Banks, such that he was able to make informed, reasoned decision about pleading guilty in accordance with the 2019 Plea Agreement.  Defendant has offered no proof to the contrary.  Moreover, all evidence of record, including Defendant's own admissions proffered through his many submissions to this Court, also prove that Defendant discussed the terms of the 2018 Plea Agreement with both counsel (meaning Attorneys Rothschild and Maknoon), but he rejected those terms primarily because he did not believe that he could be classified as a career offender.

### B. Ground 2: Defendant's Claim That Attorney Maknoon Was Ineffective in Defending Banks and/or Negotiating a Better Plea Deal

In a nutshell, Defendant makes two basic claims.  See 1707-12.  First, Defendant claims he and counsel for the Government agreed to a different plea deal than what was written in the 2019 Plea Agreement.  Second, Defendant contends that when he (repeatedly) pointed this out to his attorney, he was essentially silenced, mollified, and/or duped by his attorney into taking the 2019 Plea Agreement, which Defendant claims was less advantageous than the deal he negotiated for himself at the reverse proffer meeting with the Government.

As noted by the Government in its Response, any deal that Defendant thought he negotiated (either on his own behalf and/or through his Attorney Maknoon) at the reverse proffer meeting was not a "formal plea offer."  A formal plea offer required a writing, signed by the United States Attorney.  There were only two formal plea offers proffered by the United States

Attorney, the 2018 Plea Offer (which Defendant rejected) and the 2019 Plea Offer.  *See, Frye,*
*566 U.S. at 146.* ("[T]he fact of a formal offer means that its terms and its processing can be
documented so that what took place during the negotiation process becomes more clear if some
later inquiry turns on the conduct of earlier pretrial negotiations.")

Defendant is attempting to convince this Court that he negotiated a plea deal that did <u>not</u>
require him to plead guilty to Count 7 of the superseding indictment, and he did so during the
reverse proffer meeting.  However, Defendant freely admits that the formal, written 2019 Plea
Offer (to which he agreed during the December 11, 2019 change of plea hearing), <u>did</u> require
him to plead guilty to Count 7.  He also admits that he signed the 2019 Plea Agreement despite
the clause requiring him to plead guilty to Count 7.   In addition, at the very start of the change of
plea hearing, the following exchange between this Court and Defendant took place:

> THE COURT: Do you understand that, having been sworn, your answers
> to my questions are subject to the penalties of perjury or making a false
> statement if you do not answer truthfully?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: The Court is informed that you wish to change the plea that
> you previously entered to a plea of guilty to Counts 4 and 5, each count
> charging you with conspiracy to possess with intent to distribute and
> distribute a quantity of heroin, in violation of Title 18 United States Code
> Section 846, **and Count 7, possession with intent to distribute and**
> **distribution of a quantity of heroin, cocaine and fentanyl,** in violation
> of Title 21 United States Code Section 841(a)(1) and 841(b)(1)(C), and to
> a lesser included offense at Count 3, specifically, conspiracy to possess
> with intent to distribute and distribute a quantity of cocaine base, contrary
> to the provisions of Title 21 United States Code Sections 841(a)(1) and
> 841(b)(1)(C), in violation of Title 21 United States Code Section 846.
> Correct, sir?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Further, the Court is also informed that your plea contains
> a stipulated sentence. Pursuant to 11(c)(1)(C), the parties have agreed that
> any sentence imposed upon the Defendant shall include a minimum term

of not less than ten years. The parties understand that this minimum term of imprisonment shall serve as a sentencing floor, and the Court may impose a sentence greater than the ten years' imprisonment. The Court is further informed that pursuant to Rule 11(c)(1)(C), that you wish the Court to accept your plea and sentence you in accordance with that stipulated sentence. Is that correct?

THE DEFENDANT: Yes, sir.

* * *

THE COURT: The maximum sentence I'm authorized to impose under the law, including any applicable mandatory minimums **for the commission of each of the offenses at Counts 4, 5 and 7 and the lesser included offense at Count 3** of the superseding indictment to which you intend to plead guilty, as you and the Government have agreed and as set forth in your plea agreement, is a term of imprisonment of not more than 30 years, a fine not to exceed two million dollars, a term of supervised release of at least six years, and a special assessment of $400. Do you understand the potential sentence that the Court is authorized to impose?

THE DEFENDANT: Yes, sir.

Based on these exchanges, the Court finds Defendant clearly understood that he was (1) testifying under oath, (2) was pleading guilty to Count 7, and (3) the 2019 Plea Offer which required him to plead guilty to Count 7 contained a minimum term of imprisonment of 10 years.

In addition, Defendant signed the 2019 Plea Offer which specifically indicated that he was pleading guilty to Count 7 (as well as other offenses). When this Court asked Defendant about his signature on the document as well as his understanding of the 2019 Plea Offer, Defendant told this Court that he reviewed the 2019 Plea Agreement – which expressly stated he was pleading guilty to Count 7 – and that he understood all of the terms and content. Defendant specifically stated as follows:

THE COURT: I direct your attention to page 6 of the original plea agreement, which has been marked at Government's Exhibit No. 1. Is that your signature on page 6?

THE DEFENDANT: Yes, sir.

42

> THE COURT: Counsel, your signature?
>
> MR. MAKNOON: Yes, Your Honor.
>
> THE COURT: Did you read and review the entire agreement with your counsel before you signed it?
>
> THE DEFENDANT: Yes. I did.
>
> THE COURT: Do you understand all its terms and contents?
>
> THE DEFENDANT: Yes, sir.

Defendant's attempt to suggest that he was silenced, mollified, and/or duped by his attorney into agreeing to take a guilty plea to Count 7 of the superseding indictment is likewise without merit. Defendant's only purported evidence supporting this claim is the following exchange between him and the Court which took place during the Change of Plea Hearing:

> THE COURT: Are there any other agreements or understandings with the United States Government that are not set forth in the plea agreement?
>
> THE DEFENDANT: I don't think so, sir, no.
>
> THE COURT: Well, why don't you talk to your counsel so you can give me a definite yes or no, please. (Private discussion between Defendant and defense counsel.)
>
> THE COURT: Did you have adequate time to talk to your attorney about that question?
>
> THE DEFENDANT: Yes, I did, sir.
>
> THE COURT: Are there any other agreements or understandings with the United States Government that are not set forth in the plea agreement?
>
> THE DEFENDANT: No.

Based on the above exchange, Defendant spoke with his attorney when asked about the existence of any other agreements, and then told the Court, under oath, that he had

adequate time to talk to his attorney and said there were no other agreements with the Government that were not set forth in the 2019 Plea Agreement. Thus, no evidence of coercion was/is present here.

This Court finds that Defendant had ample opportunities during the change of plea hearing to make it known to the Court that he did not agree to plead guilty to Count 7 of the superseding indictment. The Court also notes that the date of Defendant's change of plea hearing (December 11, 2019), predated the change in the law announced by the Court of Appeals in *Nasir* (December 1, 2020). Thus, at the time Defendant agreed to change his plea and his change of plea hearing was held, Defendant would have been viewed as a career offender, regardless of whether he pled guilty to Count 7, possession of a controlled substance, or Counts 3, 4, or 5 which charged him with conspiracy to possess a controlled substance. Simply stated, at the time Defendant pled guilty in the eyes of the law, he was a career offender. No attorney could have known in December of 2019, that by December of 2020 the state of the law would change under *Nasir*, such that Defendant's guilty plea to the possession charge in Count 7 (and not his plea to the three other conspiracy charges) was the only charge which could be used to assess whether he was a career offender. Defendant's ability to look back over his plea agreement with 20/20 hindsight vision does not make his attorney assistance ineffective in 2019 given the state of the law at that point in time.

### C. Ground 3: Defendant's Claim That Attorney Maknoon Was Ineffective "Concerning Plea, Going to Trial, Rights"

In this argument, Defendant asserts that there were two ways in which Attorney Maknoon failed to provide him with effective counsel. First, Defendant claims that Attorney Maknoon failed to provide Defendant with a copy of the "prior plea offer" which was emailed from AUSA Goodman to Attorney Maknoon (*i.e.*, the 2018 Plea Agreement); and secondly, he claims that

44

Attorney Maknoon failed to obtain Defendant's file from his first attorney, Neil Rothschild. Defendant concludes that Attorney Maknoon could not have offered sound, legal advice as to whether Defendant should take a plea deal without first having possession of Attorney Rothschild's file. ECF 1707-13.

As to Defendant's first argument, the Court has adequately explained above, in subpart "III. A." of this Memorandum Opinion, that both Attorney Rothschild and Attorney Maknoon, at a minimum, discussed the contents of the 2018 Plea Agreement with Defendant, and provided him with a copy agreement itself. Defendant's submissions in support of his 2255 petition suggest that the discussions he had with his counsel caused him to reject the 2018 Plea Offer primarily because Defendant could not accept that he would sentenced as a career offender, and thus he rejected the 2018 Plea Offer, and conveyed to his counsel that he would rather proceed to trial. The Court will not rehash what it has already determined above, in section "III. A." The Court concludes as it did above: there is an overwhelming amount of evidence to support a finding that Attorney Maknoon and Defendant discussed the 2018 Plea Offer and during their discussion(s), Defendant (re-)conveyed that he was not willing to accept a plea offer based on a belief that he was a career offender (*i.e.,* a "big time drug dealer"), which carried a possibility of him serving 15 years of incarceration. Thus, Defendant's first argument is not new, and like above, it is completely without merit.

Second, Defendant argues that Attorney Maknoon could not have offered him sound legal advice regarding whether Defendant should have pled guilty to the charges without first obtaining, possessing, and reviewing a copy of Attorney Rothschild's file. Given that: (1) Attorney Maknoon met and conferred with Defendant in the jail shortly after he was appointed to represent Defendant, (2) Attorney Maknoon received an emailed copy of the 2018

Plea Agreement and discussed it with Defendant, and (3) Defendant was charged under a superseding indictment with additional criminal counts shortly after Attorney Maknoon began to represent Defendant, the Court does not find Attorney Maknoon's "conduct so undermined proper functioning of adversarial process" that an unjust result ensued here.  See*, Strickland, supra.*  As noted by the Court in subparts "III. A." and "III. B." immediately above, Attorney Maknoon adequately guided Defendant through the plea negotiation process.

### D. Ground 4: Defendant's Claim That Attorney Maknoon Was Ineffective Due To "Misadvice [Regarding] Sentencing"

In this argument, Defendant again claims that there was an agreement reached by him and the AUSA during the reverse proffer meeting which was the same as what had been offered to Defendant through the 2018 Plea Offer, insofar as this alleged verbal agreement did not require Defendant to plead guilty to the Count 7 of the superseding indictment (the possession charge), as set forth in the 2019 Plea Offer.  Defendant also claims that during the change of plea hearing, when he and Attorney Maknoon had a private conversation at the suggestion of the Court, Attorney Maknoon advised Defendant to "keep quiet."  Defendant claims he raised concerns that he had struck a different deal with the Government during the reverse proffer meeting.  Defendant claims that Attorney Maknoon was "coercive."  See 1707-14, p. 1.

The Court has addressed all of these allegations, above, specifically addressing these precise allegations in section "III. B." above.  Relying on its above analysis in section "III. B.", the Court concludes that Defendant had ample opportunities throughout the change of plea hearing to notify the Court that he did not agree to plead guilty to Count 7 of the superseding indictment charging him with possession.  The Court also concludes that as of the date of Defendant's change of plea hearing (December 11, 2019), the state of the law was such that Defendant would have been deemed a "career offender" under the advisory sentencing

guidelines, whether or not he pled guilty to the Count 7 possession charge. Thus, if Defendant had pled guilty to only the conspiracy charges, he still would have been classified as a career offender by this Court, and he would have been subjected to the same imprisonment term that he faced by pleading guilty to the conspiracy and possession counts.

Moreover, as concluded above, Defendant's two formal Plea Offers both contained 11(c)(1)(C) agreements which required Defendant to serve a minimum imprisonment term of 10 years. Thus, Defendant, who was considered to be a career offender under either agreement, faced the same potential term of imprisonment from this Court whether he pled guilty under the 2018 Plea Offer or the 2019 Plea Offer. All evidence of record demonstrates that Defendant cannot be said to have received "misadvice" from Attorney Maknoon with respect to his potential sentence.

### E. Ground 5: Defendant's Claim that Attorney Maknoon Provided Ineffective Assistance of Counsel by Failing to Investigate

Although it is somewhat difficult to discern what Defendant claims Attorney Maknoon needed to investigate or should have investigated, his comments suggest that Attorney Maknoon should have had Attorney Rothschild's file before or during the reverse proffer meeting, and because of this, Attorney Maknoon did not make a "reasonable investigation" into either the indictment or the superseding indictment returned against Defendant.

To the extent that this argument is Defendant's attempt to resurrect his claim that the initial indictment returned against him in criminal case number 18-cr-150 was flawed, (in that Defendant now claims that Attorney Maknoon should have investigated whether Defendant's argument in this regard had any merit before engaging in plea deal negotiations), this argument fails for the following reasons.

First, as noted above in footnote 4 above, Defendant wanted his first lawyer, Attorney Rothschild, to challenge the grand jury proceeding in criminal case number 18-cr-150.  When Attorney Rothschild did not do so, Defendant referred Attorney Rothschild to the Pennsylvania Disciplinary Board, who deemed Defendant's complaint meritless.  Thus, even if Attorney Maknoon failed to conduct his own investigation as to whether the indictment returned at criminal case number 18-cr-150 was flawed, it would not have changed to outcome of Defendant's sentence in this case.

Moreover, Defendant was charged by way of a superseding indictment at criminal case number 18-cr-152.  Defendant Maknoon negotiated Defendant's 2019 Plea Offer which was based on the new and additional charges brought pursuant a superseding indictment in a different case, the case filed at criminal number 18-cr-152, not the original charges filed at criminal case number 18-150.  Thus, Defendant would not have gained anything by Attorney Maknoon challenging his original indictment at case number 18-cr-150, because that indictment was essentially rendered moot upon the filing of the superseding indictment at case number 18-cr-152.

Secondly, whether or not Attorney Maknoon physically possessed Attorney Rothschild's file at the reverse proffer meeting, Attorney Maknoon did have the formal 2018 Plea Offer as well as the benefit of hearing the Government's evidence during this reverse proffer meeting.  Thus, whatever sort of additional "investigation" Defendant thinks Attorney Maknoon should have conducted (but never describes), again would not have changed Defendant's criminal history upon which his career offender designation was, and is, largely based.

Finally, Defendant had multiple opportunities to raise any concerns he had about the pleading guilty to the superseding indictment with the Court during his change of plea hearing,

but he never did so.  To the contrary, he indicated to this Court that he knew and understood the charges to which he was pleading guilty, he claimed he was doing so of his own free will, voluntarily and without being coerced, and he specifically agreed that there was nothing his attorney had not done that he had asked his attorney to do.  Accordingly, there is not merit to this ineffective assistance of counsel argument.

### F. Ground 6: Defendant's Claim That Attorney Maknoon Provided Ineffective Assistance of Counsel Due To "Sentencing Ineffectiveness"

Defendant contends that but for the short amount of time his last two attorneys spent with him prior to sentencing, meaning Attorney Maknoon and Attorney Frick (his third attorney), he would not have received the sentence he received.  With respect (seemingly) to both Attorneys Maknoon and Frick, Defendant complains that they did not obtain any information concerning Defendant's "schooling, medical or interview defendant['s] family to build a proper sentence memorandum."  Specifically with respect to Attorney Frick, he complains "if it was not for counsel's substandard performance[,] he would have received a less severe sentence had she filed the motion to withdraw guilty plea correctly by adequately arguing breach of contract" and all other objections he raised to his PSIR (not just the career offender classification).

These arguments are also without merit. It appears to this Court that both Attorney Maknoon and Attorney Frick spent ample time with Defendant.  This is evident not only given the content of the documents they filed with this Court on Defendant's behalf, but in their preparedness for the many status conferences and hearings held in this case.

As the docket reflects, Defendant pled guilty on December 11, 2019, and his draft of the complete PSIR was filed for counsel's eyes only on March 25, 2020.  Due to a COVID outbreak where Defendant was incarcerated, Attorney Maknoon requested that this Court allow him to have extra time to meet in person with Defendant in order to review the draft, attorneys' eyes

only PSIR, and the Court granted that request. ECF 1017 and ECF 1018.  After the final PSIR

was filed on the docket on April 21, 2020, Attorney Maknoon requested additional time to file

Defendant's objections to the final PSIR and to postpone the sentencing hearing, both of which

this Court granted.  ECF 1057, ECF 1080, ECF 1081, ECF 1083, ECF 1084.

Defendant began to file *pro se* motions, even though he was represented by counsel.

Attorney Maknoon filed his objections to Defendant's PSIR on June 28, 2020 – several months

before *Nasir* was decided – challenging Defendant's career offender designation by citing case

law from other jurisdictions which supported his argument that suggested that inchoate crimes

could not be used to support a career offender designation.  ECF 1129.  In response, the

probation officer prepared the First Addendum to the PSIR indicating that it disagreed with

Defendant's objection.  ECF 1130.  Following the publication of the First Addendum to the

PSIR, on July 8, 2020, Defendant sent a letter to the Court, which the court docketed at ECF

1133, re-raising the same objections to the PSIR.  On July 10, 2020, the Court denied

Defendant's request made in his letter, but ordered Attorney Maknoon to consult with Defendant

and then report that a consultation had occurred by July 29, 2020.  ECF 1134.

After granting Attorney Maknoon some additional time to consult with Defendant,

Attorney Maknoon filed a status report on August 5, 2020 indicating that he was having

difficulty communicating with Defendant at the jail where he was incarcerated.  ECF 1161.  One

week later, Attorney Maknoon indicated that he had been able to reach Defendant and that he

was requesting transcripts of prior hearings so that he could evaluate and advise Defendant as to

whether Defendant could withdraw his guilty plea.  ECF 1167.  Shortly thereafter Defendant, *pro

se*, filed a motion to withdraw his guilty plea.  ECF 1170.  On August 26, 2020, Attorney

Maknoon filed a counseled motion to withdraw Defendant's guilty plea, which, after full briefing, this Court denied on the merits on September 18, 2020.  ECF 1176 and ECF 1201.

On September 25, 2020, Attorney Maknoon filed a motion to withdraw as Defendant's counsel.  ECF 1206.  The Court granted Attorney Maknoon's motion, appointed Attorney Frick to represent Defendant, and continued Defendant's sentencing hearing until January 6, 2021. ECF 1208, ECF 1213, and ECF 1214.

Despite the fact that Attorney Frick was appointed to represent Defendant immediately after the Court granted Attorney Maknoon's request to withdraw as Defendant's counsel, and despite the fact that the Court had indicated through its prior orders that Defendant's *pro se* motions would not be entertained, Defendant continued to send the Court letters and file *pro se* motions on the docket, each one attempting to relitigate an issue that had previously been decided.[7]

After Attorney Frick was able to meet with Defendant, she filed another objection to the PSIR – this one based on the *Nasir* decision which came to fruition during the time that Defendant was awaiting his sentence.  However, as noted above, *Nasir* had no impact on Defendant's sentence.  Ultimately, after many, many continuances instigated by Defendant, Defendant's sentencing hearing, was finally scheduled for June 3, 2021, via Zoom videoconference.  However, Defendant indicated shortly after the hearing commenced, that he was not ready to proceed with sentencing.  Defendant raised many of the issues he had raised through Attorney Frick and through his *pro se* motions and letters to the Court.  Because of his

---

[7] Defendant filed at least a dozen documents on the docket, many of which were against his own interests, including an "admission of guilt" (ECF 1231) whereby he claimed to have perjured himself, and a motion for prosecutorial misconduct.  ECF 1414.  All of these motions sought the same relief – enabling Defendant to withdraw his guilty plea.

concerns, the Court stopped the virtual sentencing hearing and rescheduled the sentencing

hearing for June 15, 2021, this time, in person.  ECF 1543, p. 2.

During the June 15, 2021, in-person, sentencing hearing, the Court recapped what

occurred during the brief June 3, 3021, virtual, sentencing proceeding by noting the following:

> THE COURT  . . . The Court explained that after he pled guilty and had
> asked to withdraw his plea, the Court denied his request. The Court also
> explained on June 3, 2021, that the denial of his motion to withdraw his
> guilty plea was explained in writing by way of an order of court at
> document number 1201, and the Court further reiterated its decision to
> deny his request to withdraw his guilty plea during his status conference
> on April 28, 2021, thus there's nothing more that Mr. Banks can say or do
> at this juncture of a legal proceeding with respect to withdrawing his
> guilty plea.  Should he still wish to withdraw his guilty plea, he may
> appeal this Court's decision, but he can only get to that point by permitting
> the Court to sentence the defendant today. I know that I said all this last
> week again when Mr. Banks was on the Zoom video call of June 3, 2021.
> And I hope Mr. Banks, by being present in my courtroom today, you feel
> more comfortable with what I'm telling you.
>
> THE DEFENDANT: Yes, sir.

For the remainder of the hearing, Defendant continued to interrupt the proceedings by

professing his disbelief that he could be classified as a career offender and by re-raising all of the

various issues his three attorneys raised during the entirety of the three-year procedural history of

the case that spanned two different criminal dockets.  On several occasions during the sentencing

hearing, this Court re-explained to Defendant that he needed to be sentenced, so that he could

appeal the Court's decision denying his request to withdraw his guilty plea (and any other issues

he wanted to raise).

Given the exchanges the Court experienced with Defendant first-hand, as well as the

information provided to the Court through Defendant's counseled motions and filings, the Court

is fully satisfied that both Attorney Maknoon and Attorney Frick spent more that the requisite

amount of time attempting to counsel Defendant with respect to his situation.  At the time both

the 2018 and 2019 Plea Offers were made, as well as at the time Defendant pled guilty, he

correctly deemed to be a career offender.  Given Defendant's criminal history and the timing of

his guilty plea, *Nasir* – whose premise was thoroughly and adequately argued by two of

Defendant's attorneys – did nothing to alter Defendant's career offender status.  For all of these

reasons, the Court finds all of Defendant's arguments to be without merit.

### IV. Conclusion

Because all of Defendant's arguments lack merit and because no evidence was presented

to support any of them, the Court will **DENY** Defendant's 2255 petition.  For the reasons

explained in greater detail section "II.C." of this Memorandum Opinion, above, no evidentiary

hearing is necessary and thus, no counsel needs to be appointed.  Accordingly, the

Petition/Motions filed at ECF 1707, ECF 1708 and ECF 1710 will all be **DENIED**.  An

appropriate Order follows.

**SO ORDERED** this 7th day of February, 2023.


 s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge


cc:     All ECF Registered Counsel of Record